# UNITED STATES DISTRICT COURT
for the
District of Colorado

| | |
|---|---|
| In the Matter of the Search of<br>INFORMATION ASSOCIATED WITH<br>FACEBOOK USER ID "alicia.tangeman" THAT<br>IS STORED AT PREMISES CONTROLLED BY<br>FACEBOOK INC. | ) Case No. 21-sw-00045-STV<br>)<br>)<br>)<br>)<br>) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the __Northern__ District of __California and elsewhere__ *(identify the person or describe property to be searched and give its location)*:

**SEE "ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

**SEE "ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

X evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

X property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of 21 U.S.C. § 843(a)(3) (theft of controlled substances by deception), and the application is based on these facts:

X Continued on the attached affidavit, which is incorporated by reference.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*s/ Christopher Eric Gann*
*Applicant's signature*

Christopher Eric Gann, Special Agent, FDA-OCI
*Printed name and title*

Sworn to before me and: ☐ signed in my presence.
☒ submitted, attested to, and acknowledged by reliable electronic means.

Date: 1/22/2021

*Judge's signature*

City and state: Denver, CO         Scott T. Varholak, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

**Property to be Searched**

This warrant applies to information associated with the Facebook user ID "alicia.tangeman" that is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

## ATTACHMENT B

## Particular Things to be Seized

**I.     Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A for the time period of January 2019 to present:

(a) All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers;

(b) All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

(c) All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)   All profile information; News Feed information; status updates; videos, photographs, articles, links, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)   All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f)   All other records and contents of communications and messages made or received by the user, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)   All "check ins" and other location information;

(h)   All IP logs, including all records of the IP addresses that logged into the account;

(i)   All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j)   All information about the Facebook pages that the account is or was a "fan" of;

(k)   All past and present lists of friends created by the account;

(l)   All records of Facebook searches performed by the account;

(m)   The types of service utilized by the user;

2

(n) The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(o) All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(p) All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Facebook is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

## II. Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 21 U.S.C. § 843(a)(3) involving Alicia Nickel-TANGEMAN since January 1, 2019, including, for each user ID identified on Attachment A, information pertaining to the following matters:

(a) All communications with and between TANGEMAN and patient A.F. or anyone associated with A.F.; all searches conducted for A.F. or information related to A.F.;

(b) Information and communications regarding PCA machines or controlled substances;

(c) All communications with any person regarding a study or data collection and TANGEMAN's involvement therein;

(d) Evidence indicating how, when, and where the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(e) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(f) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s);

(g) Historical location information relevant to the crime under investigation and that helps identify the user of the account or events relating to the crime to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner and the owner's contacts.

### III.     Order Of Non-Disclosure

Pursuant to 18 U.S.C. §§ 2703(b)(1)(A) and 2705(b), the Court orders Facebook not to disclose the existence of this search warrant to any person for the period of one year, including the subscriber, other than its personnel essential for compliance with the execution of this warrant.

# AFFIDAVIT

I, Christopher Gann, being duly sworn, hereby depose and state that the following is true to the best of my information, knowledge, and belief.

## INTRODUCTION AND AGENT BACKGROUND

1. I am employed as a Special Agent with the Food and Drug Administration-Office of Criminal Investigations (FDA-OCI). I have been a Special Agent with FDA-OCI since March of 2014. Prior to my current assignment, I was a Special Agent with Homeland Security Investigations for 13 years. I have successfully completed the Criminal Investigator Training Program and the FDA's Special Agent Training Program at the Federal Law Enforcement Training Center. In addition, I am a licensed Certified Fraud Examiner through the Association of Certified Fraud Examiners. During my 19-year career as a federal investigator, I have conducted a wide range of criminal investigations involving misbranding and adulterated drugs, mail fraud, wire fraud, narcotics smuggling, money laundering, and diversion of controlled substances. As a Special Agent with FDA-OCI, I am responsible, among other duties, for conducting criminal investigations involving violations of the Food, Drug, and Cosmetic Act ("FDCA"), Title 21 U.S.C. 301-399, and other applicable violations of Title 18 of the United States Code.   As part of my training and experience, I have participated in investigations involving electronic evidence, emails, text messages, and the Internet.

2. I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook ID "alicia.tangeman" that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID.

3. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause that evidence, fruits, and instrumentalities of violations of 21 U.S.C. § 843(a)(3) (Theft of a Controlled Substance by Deception) (the "Subject Offense") are present at the location described.

4. The information contained within the affidavit is based on my training and experience, as well as information imparted to me by other law enforcement officers involved in this investigation.

5.  Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that the Subject Offense has been committed by ALICIA NICKEL-TANGEMAN (hereinafter TANGEMAN). There is also probable cause to search the information described in Attachment A for evidence and instrumentalities of these crimes, as described in Attachment B.

## BACKGROUND ON FACEBOOK

6.  Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

7.  Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

8.  Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

9.  Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

10. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming

"events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

11. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

12. Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

13. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

14. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

15. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

16. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

17. In addition to the applications described above, Facebook also provides its users with access

to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

18. Some Facebook pages are affiliated with groups of users, rather than one individual user. Membership in the group is monitored and regulated by the administrator or head of the group, who can invite new members and reject or accept requests by users to enter. Facebook can identify all users who are currently registered to a particular group and can identify the administrator and/or creator of the group. Facebook uses the term "Group Contact Info" to describe the contact information for the group's creator and/or administrator, as well as a PDF of the current status of the group profile page.

19. Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

20. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

21. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

22. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data

4

retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

23. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## PROBABLE CAUSE

24. The United States is investigating Alicia NICKEL-TANGEMAN (hereinafter, "TANGEMAN"), who was employed by UC Health at a hospital in Colorado Springs, Colorado, as a Registered Nurse. The investigation concerns possible violations of 21 U.S.C. § 843(a)(3) (theft of controlled substances by deception), among other offenses.

25. The investigation began after hospital patient A.F. reported to the hospital where TANGEMAN worked in Colorado Springs in May 2019 that he observed TANGEMAN use a key to unlock his Patient Controlled Analgesia (PCA) machine and remove hydromorphone, a schedule II-controlled substance, from the syringe inside the machine that was intended for patient administration. The patient reported that TANGEMAN squirted medication out of the PCA syringe into small cups, then returned the syringe to the PCA. The patient stated that TANGEMAN told him that she was accessing his PCA because she was conducting a "study" on the effectiveness of PCA pumps on pain relief in hospital patients.

26. After A.F. reported his interaction with TANGEMAN to the hospital, the hospital contacted TANGEMAN and requested for her to report to the hospital. On May 20, 2019, the Pharmacy Director for the hospital and a human resources employee spoke with TANGEMAN at the hospital.  The Pharmacy Director told TANGEMAN at that time that A.F. had filed a complaint against her alleging TANGEMAN had diverted controlled substances from his PCA machine.

27. On May 22, 2019, Colorado Springs Police Detective Juhl interviewed A.F. The following is a summary of A.F.'s statement as provided to Detective Juhl.

    A.F. was admitted to the hospital on May 7, 2019, due to complications from a prior surgery. A.F. was receiving pain medication to include Hydromorphone via a Patient Center Analgesic (PCA) machine. On May 12, 2019, TANGEMAN entered my room and identified herself as an employee of the pharmacy. TANGEMAN explained to me she was assisting Stanford University on a study related to the PCA machine. TANGEMAN logged into the computer, accessed the inside of the PCA using a key, and removed the syringe of Hydromorphone. TANGEMAN placed four small cups on the counter and discharged the contents of the syringe into each of the four cups. TANGEMAN then placed the Hydromorphone back into the PCA pump and departed the room. On May 18, 2019, TANGEMAN entered my room and stated she worked in the PACU and was assisting the Pharmacy in a study. TANGEMAN accessed the inside of the PCA machine with a key, removed the Hydromorphone, discharged the contents into four small cups, placed the Hydromorphone back into the PCA machine, and departed the room. There was another occasion TANGEMAN entered my room but I can't recall the details of that visit.

28. A.F. became suspicious of TANGEMAN because she was not his assigned nurse, when another nurse would change out his Hydromorphone there was always another person present as a witness, the alarm would always sound on the PCA pump when other nurses switched out the Hydromorphone but not when TANGEMAN did, and he never signed a consent form to participate in a medical study. Based upon these observations, A.F. reported TANGEMAN to another nurse at the hospital.

29. On June 2, 2019, A.F., the original patient complainant, informed Colorado Springs Detective Juhl that he had received contact via Facebook Messenger from TANGEMAN. A.F. e-mailed screenshots of the message to Detective Juhl on June 2. The screenshots are pasted below:

[CONTINUED ON NEXT PAGE]





8





10

30. On June 4, 2019, Detective Juhl contacted A.F. via telephone. A.F. stated he was upset that TANGEMAN contacted him via Facebook and felt threatened that she knew what town he lived in.

31. On July 3, 2019, I met with hospital personnel regarding the possible diversion of controlled substances by TANGEMAN. The hospital's Pharmacy Director provided evidence the hospital had gathered indicating that TANGEMAN was diverting, or stealing, controlled substances from the hospital, specifically from patient PCA machines. This included information related to patient A.F. The Pharmacy Director stated that records show that TANGEMAN was suspected of diverting hydromorphone from A.F.'s PCA machine on May 18 and May 11, 2019. He explained that A.F. was not TANGEMAN'S patient, and there was no legitimate reason for her to access his PCA pump.

32. The hospital's investigation also revealed access to PCA pumps with associated loss of hydromorphone for at least three additional patients in May 2019  The hospital's investigation also revealed that TANGEMAN was logging on to access patient records when she was off duty and would have no reason to check patient records. TANGEMAN had the ability to log on to the patient records system when she was not physically in the hospital or on duty. The access log for TANGEMAN showed that she accessed the records for patients with PCA pumps, and the records reveal that she did so numerous times in April and May 2019. TANGEMAN specifically accessed the electronic patient records for two patients for whom the hospital later determined that their PCA machines had been accessed and drug was missing.

33. On July 9, 2019, DEA Diversion Investigator Kathryn Kohman, Colorado Springs Police Detective Juhl, and I interviewed TANGEMAN at her residence in Woodland Park, CO regarding the alleged diversion.

34. During the interview, TANGEMAN stated that she did not divert drugs from patient A.F. and that she was accessing his PCA not to steal drugs but because she was involved in collecting data on PCA pumps for her nurse friend, "Sol." TANGEMAN stated she believed "Sol's" first name is Soledad. TANGEMAN stated that she did not recall Sol's last name nor did she have a contact number for her. TANGEMAN reported that "Sol" used to work with her at Salinas Valley Hospital located in California. TANGEMAN stated "Sol" reached out to her in April 2019 and requested her assistance in conducting a study on the effectiveness of the PCA pump. TANGEMAN stated that she received permission from the hospital's Research Department to conduct the study.

35. Also during the interview, TANGEMAN produced to me a print-out of an e-mail that she stated was from "Sol" but the "from" and "date" fields had been marked out with a pen. In the e-mail, the sender provides details on an alleged PCA study and requests Ms. TANGEMAN's participation. A close review of the image taken by me of the e-mail allowed

11

me to identify the e-mail address for "Sol" as a yahoo account for soledadmuernos@yahoo.com.

36. After Ms. Tangeman shared the above information, I informed Ms. Tangeman twice that it was a crime to lie to or be dishonest with a federal agent. Ms. Tangeman did not change or retract her story.

37. Thereafter, TANGEMAN brought up the fact that she sent a message to A.F. via Facebook. TANGEMAN stated, "I didn't know he had filed a complaint when I sent that. So, had I known he had filed a complaint, I wouldn't have sent him this letter." NOTE: TANGEMAN used the word "letter" interchangeably with the phrase "Facebook message." As stated above, hospital employees had advised TANGEMAN on May 20, 2019, that A.F. had filed a complaint against her.

38. On June 12, 2019, Detective Juhl interviewed the hospital's Director of Research Administration. The Director stated that TANGEMAN did not have approval to conduct a research study and that numerous steps would have to have been completed in order to approve such a research study. In addition, the Director stated TANGEMAN did not reach out to her department to request permission to conduct the study.

39. On July 29, 2019, I served a request for records to Salinas Valley Hospital in California, requesting, among other things, to verify past or current employment of a Soledad Muernos. The hospital stated they had no nurse employee named Soledad Muernos at the time of the response or previous to that date. The hospital did confirm TANGEMAN's employment at the hospital.

40. On October 26, 2020, U.S. Magistrate Judge Varholak signed an order pursuant to 18 U.S.C. § 2703(d) requesting Oath Holdings Inc. to provide records related to the e-mail address soledadmeurnos@yahoo.com. On November 24, 2020, Oath Holdings Inc. produced records in response to the order. The subscriber information provided contained "Name"- Soledad Muernos, "DOB"-11/14/1974, and "Phone"- 719-661-3202. From the investigation conducted to date, I know Tangeman's DOB is 10/17/76 and a cell phone she has utilized is 719-687-4296. On October 30, 2020, at 12:36 PM, I received a phone call from 719-687-4296 and the female identified herself as Alicia Tangeman. The area code (719) is assigned to the Colorado Springs area, and initial law enforcement records checks indicate that the phone number 719-687-4296 is a Verizon cell phone that appears to be assigned to Tangeman's minor daughter. Law enforcement is awaiting records from Verizon to confirm this information.

41. The header information provided by Oath Holdings Inc. reveals that on June 26, 2020, at 3:46 PM, an e-mail was transmitted from the Soledad account to aliciatangeman@gmail.com.   The account opening information from Oath Holdings, Inc. indicates that the e-mail account was created the same day, on June 26, 2020.  The only other

header information for e-mails in the account appear to be e-mails from Yahoo ("yahoo@mail.comms.yahoo.net") to the Soledad account. The e-mail sent on June 26 is believed to be the e-mail presented to me during the July interview of TANGEMAN.

42. On several occasions with the most recent date being January 15, 2021, I have visited the Facebook page of user Alicia Tangeman ("alicia.tangeman"). Based upon the multiple photos displayed on this Facebook page, I know the pictures on this Facebook page depict the same Alicia TANGEMAN who is suspected of diverting controlled substances from A.F.'s PCA machine. The phone number provided on the Facebook message to A.F. is the same number the hospital, TANGEMAN'S employer, had on record for TANGEMAN.

43. Based on the foregoing, there is probable cause to conclude that the TANGEMAN's Facebook account contains evidence regarding the theft of controlled substances identified herein. There is probable cause that TANGEMAN used the account to communicate with a witness and make statements regarding the theft. As also described above, Facebook records contain other information to include evidence regarding the identity of the user of the account, and times and place of access, which is also evidence related to the offense and TANGEMAN's statements regarding the offense.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

44. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## REQUEST FOR NON-DISCLOSURE

45. Pursuant to 18 U.S.C. §§ 2703(b)(1)(A) and 2705(b), I request the Court order Facebook not to notify any other person of the existence of this warrant for the period of one year. This request is made because notification of the existence of the warrant will result possible destruction of or tampering with evidence, and/or intimidation of potential witnesses.

46. For the same reasons, I respectfully request that this affidavit and the Court's Order be RESTRICTED at level 3 until further order of this Court.

## CONCLUSION

47. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for

the service or execution of this warrant. The government will execute this warrant by serving it on Facebook. Because the warrant will be served on Facebook, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

48. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

49. Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that evidence, fruits, and instrumentalities of the Subject Offense(s) may be located within the Facebook account described in Attachment A.

50. I, therefore, respectfully request that the attached warrant be issued authorizing the search and seizure of the items listed in Attachment B.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

*s/ Christopher Eric Gann*
Christopher Eric Gann, Special Agent
FDA-OCI

SUBSCRIBED and SWORN before me this  22nd  day of January, 2021.

_____
HON. SCOTT T. VARHOLAK
UNITED STATES MAGISTRATE JUDGE

Application for search warrant was reviewed and is submitted by Anna Edgar, Assistant United States Attorney.

14